Good morning, dear listeners. I am Zisa Kornick, Aaron Murphy, on behalf of the Apollos. When a government imposes a special fee on constitutionally protected conduct, it must ensure that the fee is in line with all setting actual costs attributable to regulating that conduct, because the government may not use monetary exemptions to seek to profit from or discourage the exercise of constitutional rights. In its original form, California's Dealer's Record of Sale, or DROS fee, complied with that constraint, because the fee was statutorily confined to offering actual costs associated with regulating the firearm's transfers to which the fee attached, things like running the background check and keeping the records necessary to do so. But by authorizing the use of DROS fees to fund the enforcement of prohibitions on the unlawful possession of a firearm, the state converted that fee from a permissible cost recovery fee into an unconstitutional tax on the exercise of a constitutionally protected right. But may I just start by talking a bit about why we think the Court's fees jurisprudence is the right way to approach this case? Every court... I think it's clear from your briefs, but you are not challenging the fee itself as a burden on some of the minimum rights?  We're challenging the fee as excessive in relation to the costs, the permissible costs for which we believe the fee may be imposed. So we're not saying you couldn't have a $19 fee if the actual cost to the state of performing a background check were $19. But we know that it's wrong, because in 2010, the Attorney General said, this fee is producing a multi-million dollar surplus. We don't need the fee to be this high. In order to pay for background checks, we should lower the fee. Now, the legislature decided to do something different, which was expand the uses to which the fee could be put, and that's where we think the state ran into a constitutional problem here. And the basic problem is that the expansion includes purposes that my clients have nothing to do with, because people who just lawfully purchase a firearm and comply with the restraints that apply to the transfer itself are imposing no cost on the state in relation to the Armed Prohibited Persons Program, which is a second regulatory program that's about identifying people who unlawfully possess firearms and confiscating those firearms from the people who are engaged in unlawful conduct. And there's really no sense, I don't think, as a logical matter or as a factual matter, in which you can say that the people who are the subject of these gaps in investigations are meaningfully connected to the hundreds of thousands of individuals who pay the dross fee every year and never end up on the APS list or the subject of an APS investigation. So your remedy is to reduce the fee to, say, $10? Well, we would say that the state needs to reduce the fee to whatever is commensurate with the actual cost of the background check. What does this market show about that? It's not entirely clear, but I think the best evidence about what the appropriate fee is is the suggestion that was made in 2010, which was to lower it from $19 to $14. We're not asking the court to determine the precise amount that the fee should be. What we ask the court to do is to tell them that they can use it for these purposes, and then we would leave it to the state, in the first instance, to determine once you take out these purposes, what does the fee need to be. My best guess as you sit here today is that we're talking about a reduction of a fee from $19 to $14. That's from the evidence the state's been able to give us. I don't think that they've really accounted for precisely how much the fee is used for certain purposes versus others, but that's a starting point. Perhaps it ends up that it needs to be lower. I mean, one thing that's said back then and has been said since when they explained why the fee was generating a surplus is that, through technological advancements, it just doesn't cost as much today as it used to to run the check. So you agree that the DRO fee is subject to intermediate scrutiny? Well, we think the right scrutiny is really to look at the fee-stripped students' cases, which I don't think quite follow the traditional kind of fee-stripped versus intermediate scrutiny. The traditional sentiment would be the intermediate scrutiny. We think that the intermediate scrutiny is appropriate. I mean, we're certainly reserving the argument that strict scrutiny is appropriate. We recognize that under this Court's cases, probably, you know, intermediate scrutiny may be more consistent with what the court has said. So looking at the fee-stripped church persons, it seems like the Supreme Court specifically has allowed the state to charge fees to defray. They can determine the expenses of policing activities in question. And I'm just trying to figure out, isn't that what the DROS fee does here? Or so I'm trying to figure out how exactly your best argument to why violates these jurisprudence. Sure. I think it's all about what the activity in question is. And the DROS fee, is it the activity that's being looked at or, like, what's happening with the APS fee? What about the APS? I guess I'd say both. I mean, as I read the constitutional constraint, it's that the fee has to be commensurate with the costs of the particular activity in question. So, for instance, you know, if that language comes from a case, I believe, about a parade department, you can charge a fee for holding the parade. You can't charge a fee for all the costs in the world that are attributable to the exercise of First Amendment activities. So I think the same thing applies here. This fee gets language from the parade case, which says, I'm pretty sure you can police the activities in question. Right. And what they're talking about is policing activities in connection with the parade. The court goes on to explain it means the cost of having police to do it. I guess policing the activity in connection with the purchase of the firearm. I mean, the statistics around the APS, what the APS program has done is quite impressive in terms of catching people who have been either convicted or have a mental illness or domestic violence conviction or interaction subsequent to their purchase. So I'm trying to figure out, that doesn't seem like a disconnect to me. I think you're trying to argue there is a disconnect. Absolutely. I think there's a huge disconnect, if I can understand. Sure. I think the activity in question that this fee is attached to is the transaction, the transfer, producing the dealer's record of sale to which the fee is attached. That transfer, we don't have a problem with paying fees that are associated with ensuring that that transfer is a lawful transfer. Well, included in that lawful transfer is whether or not the person is not a prohibited person. Exactly. And we don't mind that. That's the background check. Well, then why would you mind determining whether or not that person becomes that prohibited or prohibited position or subsequent? Because that's not really what, I mean, the APS program, it's not about identifying who lawfully possesses a firearm. It's about identifying who unlawfully does. And the majority of the money in that program is designed to pay for the investigatory activity of growing and confiscating the firearms. Now, my clients lawfully possess firearms. They're not generating the cost of these millions of dollars that, you know, just a few of the states should be spending money going to get firearms out of the people who are prohibited from possessing them. But we shouldn't have to pay for that activity just because we lawfully purchase a firearm. So how do you distinguish the situation from a normal, say, a hunting license, where someone pays for a hunting license for the privilege of hunting, and that money is used for enforcement of people who don't get the license? Is that precisely identical? Well, I think that's a normal social game situation. I mean, I think there's a couple of important distinctions there. First, what you're talking about is an actual licensing scheme, which is now what we're talking about, actually. So I think that if the state wanted to impose an actual licensing scheme, then we can have a conversation about whether its licensing scheme is consistent with the second amendment. And if it is, then, you know, the cost would be acceptable. But the question would first be whether the licensing scheme is permissible. Now, part of the other reason that hunting licensing fees are a little bit different is because there is a government benefit in the sense of, if the government is providing lands on which it ensures that hunting is available, so there may be benefits that are different from this, where all you're talking about is if it's used for enforcement purposes. If that's part of it, then I don't know whether you are doing this. That's unconstitutional. Well, I think that where we would draw the line, even in a licensing scheme, which this isn't, is enforcing the licensing requirements. So perhaps you could enforce a provision that said, you know, we're going to make sure everyone has the license they're supposed to have. But if someone didn't have a license and committed a separate crime, I don't think that you can charge people as part of the cost of obtaining the license the cost associated with going and enforcing that separate criminal provision that goes outside the scope of the licensing regime. And that's what happens is because it's a separate program. I mean, the state set all of this up as what is a regulatory program about producing a record of sale and policing a transaction. And APPS has statutorily created an entirely separate regulatory program that is focused on this small, small number, you know, less than one-half of 1% of transactions in the typical year that end up needing to be the subject of efforts to confiscate the firearms. So I would see how these people, the 99.5%, who are doing nothing other than lawfully purchasing a firearm, bear any more meaningful connection to the APPS program than any other under-franchised member of the general public. It's a program that's designed to benefit everybody, not to specifically benefit people who lawfully possess firearms. We all want firearms to be out of the hands of people who unlawfully possess them. And that's a cost that society generally should pay for, not selling those costs out to people who are basically just exercising constitutional rights. In terms of prudence aside, just looking at a traditional sort of Second Amendment application of intermediate scrutiny, isn't there a reasonable fit here between a fee on firearm acquisition and then the government's important objective of public safety and serving people who are prohibited from possessing firearms? I don't think there is, because of that lack of a meaningful axis between the people paying the fee and the purposes to which it's being put. And I would know, I mean, if you take a look in our opening report, sometimes the people paying the fee might be a prohibited possessor. They are also separate. But the record here reflects the state's own data, demonstrates it is less than one-half of 1%. And I just don't think that's the kind of axis that you need when dealing with constitutionally protected conduct. And I don't even think that would cut it. If we weren't dealing with constitutional conduct, isn't the axis broader than that? Isn't it public safety? I mean, hasn't that been upheld in the past? No, not in the context of imposing special monetary burdens on individuals for no reason other than to exercise their constitutional rights. I think it's the distinction between legitimacy of the end and the permissibility of the means. Are you looking at the fees, the jurisprudence, or just the general, you know, nexus? Well, I think it, I guess I'd say both. I mean, I think always you have to look at both the ends and the means. And are the means, because the whole point of the means analysis, the fit analysis, is to ask whether you're unnecessarily burdening more constitutionally protected activity than you need to. That's the question. It's not whether the means get you to the ends. It's whether the means that have been selected unnecessarily get in the way of the exercise of constitutional rights. And the government here could fund apps in many ways, in many ways that we wouldn't have any problem with. But if it says that we're going to single out people for no reason other than because they chose to exercise their constitutionally protected Second Amendment rights, we think that goes a bridge too far and is precisely what this fees jurisprudence, and really the whole means and scrutiny in general, is intended to prohibit. Thank you. Thank you. Good morning, Your Honors. Anthony Hawkins, Deputy Attorney General, behalf of Defendants and Appealings. There are a couple different ways to approach this case. Right out of the box, I think, our position is there's no reason to stray from what is developed as a typical Second Amendment analysis in the Ninth Circuit, which is going through an applicable two-step inquiry, which the court has developed, most notably in cases like Jackson and Chauvin. And going through that analysis, we think the district court got it right that instead of falling into the Second Amendment inquiry, there is no burden on the Second Amendment rights. And then even if there is a burden, proceeding to Step 2, intermediate scrutiny at most would be applicable. The statute would easily survive intermediate scrutiny. With respect to the fees jurisprudence approach, if that approach is taken, we don't think it's necessary. We think it's okay to take that approach. We think the statute and the use of the drugs fee revenues on the housing program is appropriate and would survive under that level of analysis as well. Right off the bat, on the fees jurisprudence, I just want to address Jackson and Corrigia's point, which I think hits the nail right on the head about this idea of nixness under the fees jurisprudence approach. One of the, and it's been recognized here today in oral argument, one of the purposes for which the drugs fee is collected is to run a background check to make sure that someone is entitled to lawfully possess a firearm. If it later turns out that that person is not entitled to lawfully possess a firearm, it makes sense that those drugs fee revenues, in part, are used in the recovery of that firearm. That's perfectly consistent with cases like Murdoch and Cox, the Supreme Court jurisprudence on this, which actually puts forth a pretty broad test about policing the activities in question. They talk about maintaining the general order, which is virtually a reference to maintaining, you know, policing activities that benefit the public at large. So there is a clear nixness under the fees jurisprudence. With respect to the Second Amendment analysis, just briefly on the burden issue, and perhaps like Judge Thomas talked about in his concurrence in this investor case about this may be a case where there's no burden on the Second Amendment because it's one of the consultatively lawful measures under the Second Amendment as recognized. In part, you say this is a commercial sale, and that's where you're going with that. Yes. Is that what I wanted to ask? Can you make a commercial sale if it applies to private transfers? Because in here, this all applies to private transfers as well as. It applies to any kind of transfer. And I think if you were to create, taking that view or looking at that exception, if you call that not a commercial sale, that's an exception that might swallow the rule. I think commercial, maybe like in commerce, would be an acceptable way to look at it. If you transfer, I mean, whether it's between a retailer and a customer or to private parties, it's at least akin to a commercial sale. So you have a very broad view of commercial. I understood your argument to be because they had to go to a commercial dealer to get the background check rather than therefore it's a commercial sale. You're saying, just like a Lopez argument, that it's just too commerce-y. You can look at it both ways. I mean, there's a commercial aspect to it definitely because of the each group, for a private party transfer, you have to go to a licensed dealer and fill out paperwork. And that dealer is involved in the transaction and the transfer. Let's just say that that's not the case. It just seems for my purposes that it's not. If it's not a commercial sales transaction and it's not one of the presumptive involvement measures, we're still not done with Step 1. There's also sort of an alternative, second alternative consideration at Step 1, which concerns the historical understanding of the Second Amendment. And here the record shows that taxes and fees generally on firearms are longstanding. There's a footnote in Heller, I think, Justice Stevens' dissent, specifically refers to excise taxes on firearms as part of one of the early federal firearms regulations passed in 1918. So taxes on firearms have been around for 100 years. I mean, he has laid out some of the history of that too in their briefs about late 19th century fees and taxes on firearms. So the understanding that firearms transactions might involve the payment of a fee has been around for a long time in our country. And if that's not the case, then we go to the second approach, is that right? Right. So if you get through all that, then the second step would be getting to the – the second step would be looking at an appropriate level of scrutiny. That's the language out of Chauvin and court staff. We know rational basis itself isn't available because of Heller, but anything above that, whether it's intermediate scrutiny or maybe even something slightly less or slightly more, all the way up to strict scrutiny in the appropriate case where the Second Amendment right may be destroyed, for example, but that is not the case here. And so, I mean, we think at most intermediate scrutiny would apply here. And that's determined, I get that point, by looking at how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right. And here we know that the core of the Second Amendment right is the position of firearms for the purpose of self-defense, particularly in defense of arsenal and the proceeds in plea debt. So let's go with intermediate scrutiny. What's your best support for the argument that ongoing enforcement costs may be included as part of the permissible state expenses under the fee jurisprudence here? Under the fee jurisprudence, and I think if you look at the cases, you know, cost talks about maintenance of the public order and the manner of license. I think when it comes to firearms, maintaining the public order involves making sure that people that aren't entitled to or aren't prohibited from possessing firearms or not in fact possessing firearms, which is what the AFSC program is designed to do. It's a critically important program in that regard, and it's had a lot of success over the years. Murdoch also references policing the activities in question. That's a pretty strong reference to law enforcement efforts. And even, I would say, even in the Baldwin case relied on by plaintiffs, one of the Ninth Circuit cases, in that case they struck down a $1 inspection and a $5 removal fee regarding political signs because they saw that that wasn't really for a reimbursement for a regulatory problem. They noted that political signs either interfere with the use of the streets or create a risk for disorder. Firearms, I think the legislature has acknowledged in the language of Baldwin, create a risk for disorder. It makes perfect sense to fund ongoing enforcement activities when they arise. And I would also, I mean, every court that has considered, I think this is the first court, I know, it's the first case in the Ninth Circuit that's considered, I think, a fee, any kind of fee in connection with a Second Amendment claim. And just to be clear, that's the only claim that's at issue here. It's a Second Amendment claim. It's a narrow claim. It doesn't concern the size of the fee, the imposition of the fee in the first place, the execution of the ABS program, any of that. It's a very narrow claim on the use of a portion of drowsy revenues on the ABS program. And what's your counter to Ms. Murphy's argument that because such a small percentage of initial buyers are affected by the ABS program, that that definitely supports their position? Cops refers to maintaining a public order. To me, there's a reference to the general public. And if you look at it from a parade permit perspective, the people that pay the permit actually have the parade. We're not the only people that benefit from the regulation of that parade. But there's a parade here, and the police block off all the streets so your owner can get into the parking lot or whatever dictancy here matters. We all benefit with that, but we don't have anything to do with that fee or the people that are paying that fee or having that parade. But it's all in connection with maintaining a public order of the event. And so the fact that a person that may not ultimately become prohibited benefits from that, I don't see a problem with that. And what I was going to say about every court in the country, I can see that as considered the constitutionality of a fee. On the Second Amendment case, it was upheld. The fee in the Duquam case, the Second Circuit, they upheld a $340 handgun fee in New York City. It's been for three years. That broke down to about $100 per year. We had to renew it. This is a one-time $19 fee. The Heller case, on remand, the district court considered a $25 registration fee. The circuit court, on appeal, commented on that and said that that was lawful if the rest of the statutory scheme was lawful. And also the Justice v. Town of Cicero, the Illinois case, has upheld it. And I think more recently, it's not in the briefs, but there's a case called Second Amendment Arms. I think it's the second. It also upheld the fee. So every court that has passed on this issue, although none has really thrown down this narrow claim about the actual use, but every court that has considered firearms fees, whether under a Second Amendment approach, a fee jurisprudence approach, or both, which we're perfectly comfortable with, has upheld the constitutionality of the fee. And I would ask the court to do that in this case and affirm the judgment of the district court. Thank you, counsel. Thank you. Just a few points here on your first. I'm calling on the other cases that have upheld fees. Those ones could not have been clearer. The reason they were doing so is because the record before them specifically had evidence that the fees were confined to the actual cost of the transaction. In Quam, Second Circuit said it was roughly $350 to process a licensing application. So none of those cases upholds a fee that was used to aid for anything other than costs associated with the transfer itself. And, indeed, they specifically make a point upholding that the reason that those fees are okay is because they're consistent with constraints on having the fees be attended to costs that are actually part of the conduct to which it's attached. And I think that's what also differentiates this or really gives meaning to the language in cases like Cox and Murdoch. Again, when the court said that you can have fees associated with policing the activity in question or maintaining order in the manner of license, you're talking about the specific activity, the benefit of having the streets cleared so that you can hold a parade, not all costs that can ever be attributable to the idea that people want to hold or exercise First Amendment rights or engage in door-to-door solicitation. So the costs have to have some bearing. And if you look at those cases, none of them allows for costs to be imposed. Just the general idea of maintaining public order in the abstract that has nothing to do with the particular activity to which the fee is being attached. And here, the only activity in which my clients have engaged is the awful purchase of a firearm. And that's the only activity they intend to engage in. So that's the only activity that they can be charged with costs associated with. And the only costs associated with that activity are the costs of running the background check at the time, the costs of maintaining the records and databases necessary to do so, a separate law enforcement program that's all about investigating and confiscating firearms from this small, small, small number of people that paid the fee and end up being somebody who has a firearm are costs that just cannot be settled with on the backs of people who have done nothing more than exercise their Second Amendment rights. Thank you, Counselor. Thank you all for your arguments today and your briefs. In case you're sorry, you'll be submitted for a decision.
judges: Fernandez, Thomas, Murguia